JULY TERM, 1853.

## ASSONG *vs.* SHOUGHING.

One partner has no right to apply the partnership property to the payment of his own debts, without the consent of the other partners.

This was an action on a promissory note for $1,100. · The defence set up was fraud. Verdict for defendant.

In the trial of the above cause the question arose as to the right of one partner to apply the partnership funds, effects or property, to the payment of his own private debts.

CHIEF JUSTICE LEE charged the jury that one partner had no right, as a general rule, to pay his debts with partnership property, because it was going beyond the scope of the partnership business—it was a misapplication of the partnership effects, which no member of the firm could make without the consent of all the other members; and in such cases the creditors dealing with the partner, and knowing the circumstances, will be deemed to act *mala fide*—in fraud of the partnership, and the transaction will be treated as a nullity.

Mr. Montgomery for plaintiff.

Mr. Bates for defendant.

## DECISION OF CHIEF JUSTICE LEE.—IN ADMIRALTY.

After a lengthy and most satisfactory examination of the nature and extent of admiralty jurisdiction from the most ancient times, the learned Judge Story, in the case of De Lovio *vs.* Boit *et al.,* comes to the following conclusion: " On the whole, I am, without the slightest hesitation, ready to pronounce, that the delegation of cognizance of

" all civil cases of admiralty and maritime jurisdiction" to the courts of the United States comprehends all maritime contracts, torts and injuries.   The latter branch is necessarily bounded by locality; the former extends over all contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations,) which relate to the navigation, business or commerce of the sea."

" The next inquiry is, what are properly to be deemed " maritime contracts." Happily in this particular there is little room for controversy.   All civilians and jurists agree, that in this appellation are included, among other things, charter parties, affreightments, marine hypothecations, contracts for maritime service in the building, repairing, supplying and navigating ships; contracts between part owners of ships; contracts and *quasi* contracts respecting averages, contributions and jettisons, and, what is more material to our present purpose, policies of insurance."

I can discover nothing in all the books confining the jurisdiction of admiralty courts to cases where a maritime *lien* exists, and there is not the slightest doubt in my mind that the contract involved in this case is a maritime contract, and properly within the jurisdiction of this court.   (Vide 3 Story's Com. of the Constitution, 527, 532; Conkling's Admiralty Jurisdiction and Practice, 8, 14, 50 to 55, and authorities there cited; also, the case of Fessenden *vs.* the cargo of the ship Charles, decided in this court Jan. 22, 1853, and published in the *Polynesian* of Feb. 5, 1853.)

But say the learned counsel, granting the court has jurisdiction, we contend that the plaintiff has no right to issue an attachment against our property, unless he complies with the provisions of the statute in cases of attachment issuing from the courts of the district justices. He must not only give us a bond to save us harmless from all damages, but he must make an affidavit of certain facts provided in the statute; which he has not done, and hence the suit should be dismissed.

If this case was of a like nature with those referred to in the statute, or the process the same as that contemplated in Section 6, 7 and 8, pp. 14, 15, of the 2d volume of the Statutes, then the argument to dismiss this suit for nonconformity therewith might have weight; but it is totally different.   The cases therein referred to have no relation whatever to the court of admiralty, whose rules, process and practice are entirely of another nature, and it would be as reasonable to object to the seizure of a vessel on a libel, for any cause whatever, unless made in conformity with that statute, as to object to the process in the present instance.   'Tis true, the process is new in this kingdom, and one with which the learned counsel say they are unacquainted, but it is not new in the United States, to which country the defendants belong, nor other great maritime countries; and it seems to me a just and reasonable process, well approved by the admiralty courts of older and wiser nations than this, and safe to adopt here.   It is an admiralty process known in the United States as a " Warrant to arrest the person of the defendant; with a clause, if he cannot be found, to attach his goods and chattels," &c.   (Vide Conkling's Admiralty Jurisdiction and Practice, 478 *et seq.*; Mauro *vs* Almeida, 10 Wheaton's Rep., 473.)   It is considered a most salutary proceeding in the United States, and one of great utility to com-

merce. Our admiralty practice has not been prescribed by our statutes, except to a limited extent in a very few instances, and, where it is not prescribed, our courts are left free to adopt so much of that of England, France, the United States, and other maritime countries, as they may think wise, just, and best adapted to the circumstances of this country. The only question to my mind is, is it wise, is it just, is it safe to adopt the practice of the United States in this instance? I think it is. But, say the learned counsel, there can be no lien on the "Nile" for supplies furnished the "Walter Claxton," though she has the same captain and owners, and will you then hold the "Nile" responsible for those supplies? Very true, there is no lien on the "Nile" for those supplies, and Spencer could not hold a plank of her on any such ground; but no such lien is contended for, and none sought to be enforced in the present suit. But what is claimed is this, if a party sends a ship here for supplies, which are furnished her, then refuses to pay for those supplies, and keeps himself and ship out of the jurisdiction of this kingdom, the party furnishing such supplies, provided they are necessary, may obtain a process, like the one issued in this case, to compel the appearance of the owner of the ship, and, in case he cannot be found, to seize any other ship or property belonging to the same owner, within the jurisdiction of this court, and hold the same until his debt shall be satisfied, or the payment thereof secured, in case it shall be found just. This process is legal and equitable, and cannot be otherwise than safe to the ship owner, especially where, as in this instance, good and ample security is given by the plaintiff to pay all damages in case he fails to make good his demand. The learned counsel seem to misapprehend the nature of this proceeding altogether, and treat it as a process *in rem* against the "Nile," while in fact it is no such thing, but a process *in personam* against the owners of the "Walter Claxton," under which the "Nile" is taken just like any other property, in the absence of the owners, and held as a security for the plaintiff's debt. It is no hardship upon the defendants, for if they wish to release their property, all they have to do is to give a bond or stipulation with sufficient sureties to pay the amount that may be found justly due to the plaintiff under his maritime contract.

But there is a third and last ground on which it is claimed this suit should be dismissed, namely, for informality of service. It is said the service has not been in accordance with Section 3, p. 40, 2d vol. Stat. Laws, which requires that in case the defendant cannot be found a copy of the petition, process, and other papers should be left "with some agent or person transacting the business of the defendant," &c. To this it was answered that a copy was served on the counsel of the defendant, and that, in any event, the appearance of the defendants by their counsel cures any informality of service, and it is now too late to raise any objection to that service. But it is unnecessary for me to discuss the question whether the service has been in accordance with the statute referred to, and whether, if not, it has been cured by the appearance of defendants' counsel; for the process and service contemplated in that statute are not at all applicable to this case, and consequently can have no bearing upon it. Neither is this process named and its service prescribed in Section 20, p. 46, of the Act to organize the Judiciary, 2d vol. Stat. Laws, which the learned

counsel for defendants contend requires that a copy of the petition should be left on the "Nile." It is not a process "issued in any such case" as is defined in said section of the statute. The "Nile" is not attached for any "maritime lien or liability" attaching to that *particular vessel*, but is seized like any other *property of the defend-ants*, under a process *in personam*. In my opinion, the Marshal hav-ing published in the *Polynesian* newspaper the substance of the libel, the process issued, and the return thereon, with a notice to all per-sons interested, to show cause if any they have why the prayer of the libellant should not be granted, and having also affixed a copy of the same to the mainmast of the ship, agreeably with the order of the court, the service has been complete, good, and fair to all parties.

The great and paramount object in courts of admiralty, as it should be in all courts, is prompt, speedy and substantial justice to all par-ties, in every case, without regard to nice technicalities, and I see no reason, thus far, why the plaintiff's suit should be dismissed.

Mr. Bates proctor for complainant.

Mr. Blair and Mr. Harris proctors for defendants.

---

## DECISION OF CHIEF JUSTICE LEE.—IN ADMIRALTY.

---

### CHARLES LE BON *et al. vs.* SHIP YOUNG AMERICA.

Before issuing process to attach the ship on a libel for seamen's wages, the court summoned the master to appear and show cause against it.

The complainants filed their libel for wages alleged to be due them for services on board of the "Young America," on her recent pas-sage from San Francisco to Honolulu; but before issuing process against the ship, the court, desirous of avoiding vexatious or unneces-sary litigation, summoned the master of the "Young America" to appear before the Chief Justice and show cause why the prayer of the complainants for such process should not be granted.

Before proceeding to the decision of the case, allow me to say that I feel the responsibility resting upon me in this class of cases to be a very weighty one; for while I am bound to protect the mariner, who is a special favorite with courts of Admiralty, in all his just rights, a due regard for the welfare of commerce, and, I may add, for the sailor himself, who is "proverbial for his rashness and prone-ness to error, when on shore," requires me to take every measure in my power to prevent unnecessary litigation.

Before issuing the process prayed for, I must be satisfied that the wages claimed are probably really owing, and are unjustifiably with-held. Now what are the facts of the case. It is agreed by both par-ties that the complainants were shipped "by the run," for a voyage from San Francisco to Honolulu, for which they were to receive the sum of Fifty Dollars each. The voyage has been performed, and the only difference between the parties is, that while one side alleges the wages to have been paid, the others say they have never receiv-ed a farthing. Captain Babcock testifies that he paid the shipping

master in San Francisco their wages in full, it being the custom of that port that wages "by the run" should always be paid in advance; and that the complainants were called into the cabin of the ship, previously to her sailing, and then and there acknowledged to having received their pay from the shipping master.   This evidence is corroborated by that of Christopher Gill, the first mate, and Joseph Harley, the steward,—the latter being present during the whole interview. On the contrary, the complainants testify that they were stolen from a French ship, just arrived in San Francisco, and were taken on board the " Young America," in the night, by the shipping agent, who promised them fifty dollars each for the run, and told them they should be paid when the sails were furled in Honolulu.   They further testify that they cannot write their names, and never saw or signed any shipping articles, and have never received any wages.   They are Frenchmen, understanding very little English, and when they were called to the cabin, as testified by the captain, they state that they supposed it was simply to answer to their names, which they did, and then passed immediately forward to their work.

After a careful examination of the evidence, I am satisfied that the master of the "Young America" *did* pay the shipping master in San Francisco the wages of the complainants, as stated by him, and hence I cannot issue the process prayed for.   But, say the complainants, the shipping articles don't show that we have been paid, and how, with them before you, can you come to such a conclusion ?   The shipping articles, I answer, are entirely unworthy of serious consideration in this case, when compared with the evidence of the master and others; for they are nothing but a loose, informal piece of paper, bearing no date, and according to the evidence of both parties, false in more respects than one.   The articles show that the complainants are shipped *by the month*, while according to the evidence of both master and mariners, they were shipped *"by the run."*   In my opinion, the shipping master, who evidently drew up this loose, hasty paper, intended to place the " $50," set opposite the names of the respective complainants, in the column of "advance wages;" but by mistake placed it in the next column of "wages per month," and hence arises the error.

But, notwithstanding I believe the captain has paid the *shipping master* all the wages of the complainants, still, I do not believe that the seamen ever received a cent of that money.   At first I thought they were in debt to a boarding master, who was present in the cabin when they were called below, and that his bill had swallowed up their wages, but it seems the complainants were stolen by the shipping master from a French ship, just arrived, and transferred to the "Young America," without ever having been ashore in San Francisco, and in that case, there could have been no bills against them. What I do believe is this,—that the shipping master, though he received the wages from Capt. Babcock, never paid them to the men; and when they were called into the cabin and nodded their heads, as Harley says, to the question put to them by the shipping master, they supposed that they merely answered to their names; for evidently they understood next to nothing of the English language.   I believe that the complainants in their anxiety to escape from the French ship, in order to better themselves, as they say, in the "Young America,"

o

surrendered themselves into the hands of an unscrupulous agent, who, taking advantage of their ignorance, has cheated them out of their money, and perhaps left them without a remedy, unless as against him.

But, after all, I may be mistaken; and although I cannot conscientiously grant a process against the vessel, the complainants may still sue the captain for their wages; and taking into consideration the reasons there are to believe that the complainants have not been paid by the shipping master, as well as to avoid the expense, inconvenience and vexation of further litigation, I would advise the master to present the complainants ten or fifteen dollars each. It seems to me equity requires that they should not be turned away penniless.

Mr. Blair, Proctor for complainants.

Mr. Bates, Proctor for defendant.

The master gave the complainants $10 each, agreeably with the advice of the court.

Honolulu, December 12, 1853.

---

## JANUARY TERM, 1854.

---

## PIERCE HEGARTY *vs.* B. F. SNOW.

The law of sales implies a warranty that the article purchased is merchantable, that is, that it possesses some value—that it is fit for some purpose, and can be sold at some price. Secondly, the law implies a warranty that the article is reasonably fit for the use for which it is *known* to be intended.

The law implies a warranty that goods are merchantable in all cases where, from their nature or situation at the time of sale, an examination of them is impossible.

But where the buyer can examine the goods if he choose, and especially where he does so, he must take the consequences, if through carelessness or negligence, he omit to make a thorough examination. The law will not protect the buyer in such cases, where the seller has not undertaken to furnish an article of a particular kind or quality, and has done nothing to mislead the buyer.

The law makes a distinction between the sale of provisions in small quantities for domestic use and consumption, and the sale of large quantities of provisions *as merchandise.*

Where the contract has been executed, and the goods paid for, the vendee has no right, in the absence of fraud, to return them upon their failure to correspond to the warranty, but must sue upon the warranty, and he can recover the difference between the price paid and the actual worth of the goods.

This was an action brought by the plaintiff to recover the price of 150 bbls. of Rye Flour, purchased by the plaintiff of the defendant in December, 1852, for exportation to San Francisco, together with all damages resulting to the plaintiff from his inability to sell the flour on account of its sourness. The ground of the action was an alleged violation of a warranty on the part of the defendant that the flour was sweet and in marketable condition.

The facts as they appeared in evidence were, that the flour was purchased without any express warranty as to its quality, at $14 per bbl., and that, at the time of the purchase, it was not open to inspection, but in the hold of the bark Aucland, lying at the wharf in Honolulu. That subsequently it was rolled out on the wharf and delivered to Hegarty's agent, who, discovering that some of the barrels were stained and in bad condition, refused to accept them, and they

were rolled aside.  Snow found fault at the rejection of these stained barrels, and said that their discoloration outside was no evidence that the flour was bad inside, whereupon the agent consulted with Hegarty, after which he procured a flour trier and examined the barrels. The agent testified that he thought the flour upon taste and smell to be sour, and so informed Hegarty, but Snow thought it was not, and Hegarty subsequently accepted part of the stained barrels, though not all.  The flour was shipped to San Francisco with lumber and other cargo, and on its arrival there was found to be sour, and nearly, if not quite unsaleable.  The plaintiff brought the flour back to Honolulu and offered to return it to the defendant, who declined receiving it, upon which the plaintiff stored it in the Custom House, and brought this action, not only to recover back the money he had paid for the flour, but the freight on the same to and from San Francisco, together with storage and all other expenses consequent upon the purchase.

The case was conducted and argued with marked ability by Messrs. Montgomery and Blair for the plaintiff, and by Mr. Bates for the defendant, the former contending that there was an implied warranty in the sale, that the flour was sweet, and suitable for exportation to San Francisco, the purpose for which it was bought, and that the doctrine of *caveat emptor* did not apply to the plaintiff in this case, inasmuch as the flour was not open to inspection at the time of the purchase, but lying in the hold of the bark " Auckland."  The counsel for the defendant argued on the contrary, that, in the absence of any express warranty or deception on the part of the defendant, no implied warranty could be raised as to the quality and condition of the flour; and that the doctrine of *caveat emptor* did apply in this case, as the plaintiff had the opportunity of inspecting the flour on its delivery, and actually did inspect such barrels as he thought unsound, and also rejected some.

CHIEF JUSTICE LEE charged the jury in substance as follows, viz:

This case, gentlemen of the jury, is an interesting one, and no more interesting than important, involving as it does, serious questions of law, affecting the every day commerce and business of the islands; and which, hitherto, have never been fully discussed and settled in this court.  We are called upon in this case to establish rules for the government of our merchants and others in all their sales and purchases.  How important then, that while we are free and unembarrassed by former decisions and precedents, we should establish sound rules—rules which shall have a firm foundation in reason, justice and equity, and such as shall promote fair dealing, good morals, the highest honor and the public weal.  Instead of adopting the harsh old doctrine of *caveat emptor*, or, buyer beware, which requires the vendee to be constantly on his guard against the gross representations, the deceitful praises and cunning lures of the vendor, we should lay down such rules as will check fraud of every kind, protect the ignorant, and teach the vendor that in all the representations made by him as an inducement to the sale of his goods, he should tell the truth, the whole truth, and nothing but the truth.  Such rules as will require of both vendor and vendee not only good faith, but the most scrupulous good faith; not only honesty, but the most exalted honesty, or, as that great and good jurist Judge Story has expressed it, *uberrima*

*fides* in all that relates to the sale and purchase. The maxim of *caveat emptor*, or that the purchaser buys at his own risk, unless the seller gives an express warranty, which is contended for on the authority of the leading case of Chandelor *vs.* Lopus, and the long line of cases which followed that precedent, can no longer be said to hold that empire over the law of sales, which it formerly did; for the modern decisions on this subject have so trenched upon the doctrine as to reduce it to a mere shadow.

I do not consider the case of Chandelor *vs.* Lopus good authority for the purpose for which it is cited; for it was decided on the pleadings of the case, and not on its merits. The old common law rule of *caveat emptor*, says Story on Sales, has been losing ground, and the law has been tending towards the doctrine of the Roman law, which is its antipode—*caveat venditor*, or, beware seller—until it now occupies a middle ground between the two, by requiring the strictest good faith on the part of the seller in all that he says and does, and throwing on the buyer the responsibility for any foolish mistake, or wrong conclusions, which may result from his trusting to his own judgment.

It is not contended, in this case that there was any express warranty of the quality of the flour, but it is said the law implies one. It is true that the law does imply a warranty in some cases; for example, it implies a warranty that the article purchased is merchantable, that is, that it possesses some value—that it is fit for some purpose, and can be sold at some price. Secondly, it implies a warranty that it is reasonably fit for the use for which it is *known* to be intended; that is, if a man sells an article for a particular purpose, he thereby warrants it fit for that purpose.

But lest I should be misunderstood, or state this doctrine of implied warranty too strongly, let me illustrate my idea by examples. The law will imply a warranty that goods are merchantable in all cases where, from their nature or situation at the time of the sale, an examination of them was impossible. Thus, if goods be at sea, or stowed in the hold of a ship, as in this case, or in a storehouse, so that only the surface can be seen; or if they be in bales, so that an examination of the centre cannot be made without tearing each bale to pieces, the seller will be understood to warrant them to be merchantable, and of the quality demanded and expected by the buyer. He cannot, says Lord Ellenborough in the case of Gardner *vs.* Gray, without a warranty, insist that the article shall be of any particular quality or degree of fineness; but the intention of both parties must be taken to be, that it shall be *saleable* in the market under the denomination mentioned in the contract between them. But where a man can examine the goods if he choose, and especially where he does examine them, as it is said Hegarty did in this case, he must take the consequences, if through carelessness or negligence he omit to make a thorough examination. The law will not protect a man from the consequences of his own carelessness in such cases, where the seller has not undertaken to furnish an article of a particular kind or quality, and has done nothing to mislead the buyer. This, if I mistake not, is the language of all modern writers and judges, on the law of sales.

But, say the learned counsel for the plaintiff, this is a sale of provisions, and whatever may be the law in reference to other goods, in

the sale of provisions there is always an implied warranty that they are sound and wholesome. It is true that an implied warranty of soundness is raised in the sale of provisions, on the ground that such a warranty is necessary for the preservation of health and life. But a distinction has been made between the sale of provisions in small quantities for domestic use and consumption, and the case of a sale of large quantities of provisions, *as merchandise,* for exportation. For example, if a man should step into one of our stores and order a barrel of flour to be sent up to his house, for family use, there would be an implied warranty that it was sweet and wholesome; but if he should ask for flour, and buy a hundred barrels, without a single question as to its condition and quality, the flour being open to his inspection, and he relying solely on his own judgment, the case would be far different. In the latter case he has bought the flour in the same manner as he would any other merchandise, and in the absence of any misrepresentation or act on the part of the seller, calculated to mislead him, he must be supposed to have taken the risk of the sweetness of the flour upon himself.

Mr. Montgomery and Mr. Blair, for plaintiff.

Mr. Bates for defendant.